BEAL BANK, Appellant,

v.

Edwin R. SIEMS, Michael Fort, and
Teresa A. Vokoun, Appellees.

No. 02–0556.

Supreme Court of Iowa.

Oct. 8, 2003.

Michael J. Cunningham and Jeffrey A. Kelso of Howe, Cunningham & Lowe, P.L.C., Urbandale, for appellant.

Jerrold Wanek of Garten, Wanek & Morse, Des Moines, for appellees Edwin R. Siems and Teresa A. Vokoun.

Jerry C. Estes of Estes Law Offices, Fort Dodge, for appellee Michael Fort.

TERNUS, Justice.

The appellant, Beal Bank, sought to enforce its rights under various mortgages and personal guaranties given by the appellees, Edwin R. Siems, Michael Fort, and Teresa A. Vokoun, to secure a loan made by a predecessor bank to Douglas Avenue Storage Limited [DASL]. The district court ruled Beal Bank could not foreclose a mortgage given on property owned by Vokoun and located on North 3rd Street in Marshalltown because it was the homestead. The court also held Beal Bank could not enforce a personal guaranty given by Fort because Fort's guaranty had been discharged. On Beal Bank's appeal, we affirm.

## I. *Background Facts and Proceedings.*

Edwin Siems, Wayne Catron, Timothy Titus, and Michael Fort were the original owners of DASL, a limited liability company formed for the purpose of building and operating a large storage facility in Urbandale, Iowa. From the beginning, it was anticipated that Fort's involvement would be limited to construction of the facility and its initial operation. Construction financing was obtained through Hartford Carlisle Savings Bank [hereinafter "Hartford"] in 1996. Collateral for the loan consisted of a mortgage on the storage facility, unlimited personal guaranties from Catron and Siems, and a $100,000 guaranty from Fort. These guaranties expressly covered future loans to DASL and were effective until the debt was satisfied or until the guarantor sent notice of revocation by certified mail.

Vokoun was Siems' wife. She mortgaged two Marshall County properties titled in her name as security for the loan made to DASL. One property was identified as 304 North 3rd Street, Marshalltown, Iowa, and the other as 1351 Prairie Avenue, Marshalltown, Iowa. It was understood that these mortgages would be released upon completion of construction and that occurred in April 1998.

During the summer of 1998, Titus bought out Catron's and Fort's interests in DASL. Hartford approved the buyout and, pursuant to a conversation between Fort and Hartford's president, Fort wrote to the president setting forth the conditions of the sale and enclosing a notarized assignment of Fort's interest to Titus. Fort requested in the letter that Hartford "hold on" to the assignment until three matters had been completed: (1) a "full release" of Fort's guaranty; (2) payment of the sale price; and (3) payment of a bill for tax services rendered to DASL by Fort. Fort did not specify the manner of release of his guaranty, but checks were subsequently issued by Hartford in satisfaction of the second and third conditions.

In September 1998 permanent financing was put into place with a new loan issued by Hartford to DASL, and the original loan was marked paid. The new note was secured by mortgages on DASL's real estate, as well as personal guaranties from Vokoun, Siems, and Titus. Vokoun also executed new mortgages on the two Marshall County properties. At that time, Vokoun was living at the North 3rd Street address, caring for her mother who had a terminal illness. Siems was living at the residence on Prairie Avenue. Siems did not sign either mortgage.

Subsequently, Hartford went into receivership and the Federal Deposit Insurance Corporation (FDIC) was appointed the receiver. The promissory notes, guar-

anties, and mortgages associated with DASL were purchased from the FDIC by Beal Bank. By then, DASL was in default. So, on July 19, 2000, Beal Bank filed a petition for foreclosure on DASL's property and, in addition, sought recovery from the various guarantors and mortgagors securing the September 1998 DASL note. A judgment and decree of foreclosure was entered against DASL. A subsequent sale of the storage facility left a sizable deficiency judgment. Beal Bank then attempted to collect the deficiency from Siems, Catron, Titus, Vokoun, and Fort based on their personal guaranties and to foreclose on the mortgages given by Vokoun.

Prior to commencement of this action, Siems, Vokoun, and Titus received a discharge from their debts in bankruptcy court. In the bankruptcy proceeding involving Siems and Vokoun, Vokoun asserted the North 3rd Street property was exempt as her homestead, while Siems claimed the Prairie Avenue property as his exempt homestead. Both exemptions were allowed, although the discharge stated that a creditor having a valid mortgage against the debtor's property could enforce the lien if it had not been eliminated in the bankruptcy case. (At the time the present case was tried, Siems and Vokoun resided together at the Prairie Avenue property and considered it to be their homestead.)

The case proceeded to trial before the court. The only issues submitted to the court were the enforceability of the mortgages given by Vokoun on the Marshall County properties and the liability of Fort under the personal guaranty he gave Hartford to secure the construction loan. (The plaintiff had previously dismissed Titus from the action, and Catron confessed judgment at trial and was excused from further proceedings.)

The district court ruled that the mortgages were not enforceable. First, the court noted that Siems, the mortgagor's spouse, did not sign the mortgages and, therefore, pursuant to Iowa Code section 561.13 (2001), the encumbrances were "absolutely void," not only as to Siems, but as to Vokoun, the mortgagor, as well. Alternatively, the court concluded that Siems enjoyed a dower right in the properties that could not be divested without his consent.

Regarding the limited guaranty by Fort, the trial court concluded it had been discharged in several ways or abandoned by Hartford. First, the court ruled that Hartford's actions upon Fort's buyout by Titus operated to discharge the guaranty. The court rejected Beal Bank's argument that revocation by certified mail was required, noting that the discharge here was more akin to a release than a revocation. Secondly, the court found evidence of abandonment of Fort's guaranty in the permanent financing documents. The new financing did not include a personal guaranty from Fort, even though the remaining owners signed new guaranties. In addition, the new note expressly included as "collateral" the guaranties of Siems, Vokoun, and Titus, but not those of Catron and Fort. Moreover, a subsequent promissory note for $25,000, while listing all five individuals, showed that Catron's and Fort's names had been crossed out. The final reason mentioned by the court in support of its ruling was the fact that under banking standards Fort should have been given notice of the new note and terms if he was to guarantee the obligation, but the record showed he was not given such notice.

Although Beal Bank argued that it was a holder in due course, entitled to enforce Fort's guaranty, the trial court held the documents known to the plaintiff provided

it with notice that Fort's guaranty had been released. The court also rejected Beal Bank's contention that the statute of frauds relating to credit agreements contained in Iowa Code section 535.17(2) barred Fort's oral understanding with Hartford. The court concluded this code section was not applicable under the facts of this case.

Beal Bank's appeal from these rulings is now before this court. Beal Bank challenges the district court's application of section 561.13 to bar enforcement of the mortgage on the North 3rd Street property. It also claims error in the trial court's conclusion that Fort's obligation under the guaranty was discharged.

## II. *Enforceability of Vokoun's Mortgage on North 3rd Street Property.*

■ A. *Scope of review.* Our review of the trial court's judgment on Beal Bank's equitable claim to foreclose Vokoun's mortgage is de novo. *Hawkeye Bank & Trust Co. v. Michel,* 373 N.W.2d 127, 129 (Iowa 1985).

■ B. *Issues.* The trial court held the mortgages executed by Vokoun on the Marshall County properties were void because Siems, Vokoun's spouse, had not signed the mortgages. Beal Bank challenges this ruling only as it pertains to the North 3rd Street property. The plaintiff does not assign as error the court's ruling that the mortgage given on the Prairie Avenue property is unenforceable and, therefore, we do not address the validity of the mortgage on that real estate.[1] Additionally, because we conclude the North

3rd Street property's status as a homestead renders the mortgage on that parcel unenforceable, we do not consider the district court's alternative ruling that Siems' dower interest in the property precluded foreclosure of the mortgage.

C. *Discussion.* Our analysis begins with the statute imposing restrictions on the transfer or encumbrance of homestead property, Iowa Code section 561.13. That statute provides in relevant part:

> A conveyance or encumbrance of . . . the homestead, if the owner is married, is not valid, unless and until the spouse of the owner executes the same or a like instrument, or a power of attorney for the execution of the same or a like instrument, and the instrument or power of attorney sets out the legal description of the homestead.

Iowa Code § 561.13; *see also id.* § 561.16 (providing person's homestead is exempt from judicial sale). There is no dispute in the present case that Siems—the spouse of the owner—did not execute the mortgage Beal Bank seeks to enforce, nor did he sign a similar instrument or power of attorney. The only issue, then, is whether the North 3rd Street property qualifies as a "homestead."

■ The legislature has defined a "homestead" as follows:

> The homestead must embrace the house used as a home by *the owner,* and, if the owner has two or more houses thus used, *the owner* may select which the owner will retain. . . .

Iowa Code § 561.1 (emphasis added). In addition to this statutory definition, this

---

1. Beal Bank's failure to challenge the trial court's exemption of the Prairie Avenue property also undermines its argument that Siems and Vokoun cannot claim both properties as their homestead. While it is true that a property owner must choose which property is to be the "homestead," *see* Iowa Code § 561.1, the only issue before us is whether the parties' claim of the North 3rd Street property as a homestead is legitimate. We cannot "fix" any error in the trial court's recognition of two homesteads when there is no challenge lodged against the second homestead, here the Prairie Avenue property.

court has confirmed that actual use, not a mere intent to occupy the property, must exist "to impress the property with the character of a homestead." *Elston & Green v. Robinson,* 23 Iowa 208, 211 (1867); *accord Hale v. Heaslip,* 16 Iowa 451, 452 (1864). The person claiming a homestead has the burden to establish this claim. *Hawkeye Bank & Trust Co.,* 373 N.W.2d at 130.

■ In challenging the trial court's decision that the North 3rd Street property qualified as a homestead, Beal Bank appears to concentrate on the fact that, at the time the mortgage was given and through the time of trial, Siems lived at the Prairie Avenue residence and claimed that property as his homestead. The plaintiff argues that Siems "selected his homestead as the Prairie Avenue property, not the North 3rd Street property." Therefore, argues Beal Bank, "he should not be granted additional homestead rights as to the separate property in which his wife was residing."

■ Where the spouse of the owner lives, however, is not the focus of the inquiry in determining whether a certain parcel of real estate is a homestead. *See Lunt v. Neeley,* 67 Iowa 97, 100, 24 N.W. 739, 740 (1885) (holding fact that spouse of owner did not reside in homestead at time of conveyance "did not affect the character of the property" as homestead property; so long as owner continued to reside there, "the homestead rights of both were preserved"). Rather, the determinative fact is whether *"the owner"* used the house as a home and whether *"the owner"* selected that house as his or her home. *See* Iowa Code § 561.1 (emphasis added). "The owner" in the present case is Vokoun, not Siems. The record is undisputed that at all material times, Vokoun lived at the North 3rd Street residence, using it as her home and claiming it as her home. Thus,

at the time Vokoun signed the 1998 mortgage, the North 3rd Street property was her homestead. Consequently, under section 561.13, Vokoun's homestead could not be encumbered without the consent of her spouse—Siems. Because Siems did not consent, the mortgage is not valid. *See Anderson v. Culbert,* 55 Iowa 233, 235, 7 N.W. 508, 508 (1880) (holding husband's conveyance of homestead in exchange for other real estate was void where wife did not sign contract, even though "she had knowledge of the trade and encouraged it").

■ Beal Bank also argues that because "[n]either party resided in and claimed the North 3rd Street property as their homestead at the time of trial[,] . . . neither party had the right to claim the homestead exemption as a defense to [Beal Bank's] foreclosure petition concerning the North 3rd Street property." This argument has no merit, however, because the validity of the encumbrance is determined as of the time it is executed. *See Belden v. Younger,* 76 Iowa 567, 570, 41 N.W. 317, 318 (1889) (holding abandonment of homestead after conveyance by wife alone "did not validate her transfer of the property without the concurrence of the husband"); *Lunt,* 67 Iowa at 101, 24 N.W. at 740 (holding that invalid assignment "was not validated by the subsequent abandonment of the property" by the owner). Thus, Vokoun's abandonment of her homestead at North 3rd Street and her relocation to the Prairie Avenue property *after* execution of the mortgage does not render the mortgage enforceable.

Because the mortgage sought to be enforced by Beal Bank was not signed by Siems, it is void as to both Siems and Vokoun. *See Hostetler v. Eddy,* 128 Iowa 401, 406, 104 N.W. 485, 487 (1905) (holding contract void, due to failure of wife to sign contract, "was void in favor of both hus-

band and wife"); *Goodwin v. Goodwin*, 113 Iowa 319, 324, 85 N.W. 31, 32 (1901) ("A conveyance of a homestead occupied by husband and wife, in which the wife does not join, is invalid for any purpose."); *see also Thayer v. Sherman*, 218 Iowa 451, 458, 255 N.W. 506, 509 (1934) (holding statutory provision is "for the benefit of all who are interested in the homestead"). Therefore, based on our de novo review, we agree with the trial court that the plaintiff cannot foreclose the mortgage on the North 3rd Street property.

### III. *Enforceability of Fort's Guaranty.*

A. *Issues.* Beal Bank argues that it should be able to recover under Fort's guaranty for two reasons. First, it claims, contrary to the district court's view of the evidence, that there is insufficient proof that the guaranty was discharged. This argument has two components. Beal Bank asserts that any discharge of Fort had to be in writing and signed by Hartford pursuant to the statute of frauds for credit agreements set forth in Iowa Code section 535.17(2). Even if that statute does not apply, contends the plaintiff, the evidence falls short of proving Hartford abandoned Fort's guaranty. In addition to this challenge to the sufficiency of the evidence, Beal Bank claims it is not bound by the allegedly undocumented release of Fort because it is a holder in due course. We consider each argument separately.

 B. *Scope of review.* We review the trial court's decision that Fort was not liable under his guaranty for the September 1998 loan to DASL for correction of errors at law. *Wellman Sav. Bank v. Adams*, 454 N.W.2d 852, 855 (Iowa 1990). Although the trial court's legal conclusions are not binding under this standard of review, we are bound by its findings of fact, provided they are supported by substantial evidence. *Land O'Lakes,*

*Inc. v. Hanig*, 610 N.W.2d 518, 522 (Iowa 2000). "Evidence is substantial for purposes of sustaining a finding of fact when a reasonable mind would accept it as adequate to reach a conclusion." *Falczynski v. Amoco Oil Co.*, 533 N.W.2d 226, 230 (Iowa 1995). "In assessing the evidence, we view the record in the light most favorable to the prevailing party, indulging in all legitimate inferences that may fairly and reasonably be deduced from the evidence." *Pollmann v. Belle Plaine Livestock Auction, Inc.*, 567 N.W.2d 405, 409 (Iowa 1997).

 C. *Applicability of statute of frauds for credit agreements.* Iowa Code section 535.17(2) provides in pertinent part:

> Unless otherwise expressly agreed in writing, a modification of a credit agreement *which occurs after the person asserting the modification has been notified in writing that the oral or implied modifications to the credit agreement are unenforceable and should not be relied upon,* is not enforceable in contract law by way of action or defense by any party unless a writing exists containing the material terms of the modification and is signed by the party against whom enforcement is sought. . . .

Iowa Code § 535.17(2) (emphasis added). A " '[c]redit agreement' means any contract made or acquired by a lender to loan money, finance any transaction, or otherwise extend credit for any purpose, and includes all of the terms of the contract." *Id.* § 535.17(5)(*c*). A "modification" of a credit agreement "includes change, addition, waiver, rescission, and any other variation of any kind whether expressly made or implied by, or inferred from, conduct of any kind." *Id.* § 535.17(5)(*f*).

In arguing the applicability of these provisions, Beal Bank contends Fort is attempting to modify the terms of his guar-

anty. Fort's guaranty was expressly made "continuous" and expressly covered all DASL indebtedness to Hartford existing at the time the guaranty was executed as well as debts "hereinafter incurred or created." The plaintiff claims any modification of these terms that would relieve Fort from liability for the September 1998 loan to DASL is unenforceable because it was not in writing and signed by Hartford as required by section 535.17(2). The trial court rejected Beal Bank's argument on several grounds, but we limit our discussion to one. We agree with the trial court's conclusion Fort was not given the notification mandated by this statute so as to trigger application of the in-writing requirement.

Section 535.17(2) makes an oral modification of a credit agreement unenforceable only if "the person asserting the modification [here Fort] has been notified in writing that oral or implied modifications to the credit agreement are unenforceable." Iowa Code § 535.17(2). Although "[t]his notification can be included among the terms of a credit agreement," "[t]o be effective, the notification and its language must be conspicuous." *Id.* The statute provides explicit guidance on compliance with this requirement:

A notification referred to in subsection 2 in the following form in boldface, ten-point type, complies with the requirements of this section:

**IMPORTANT: READ BEFORE SIGNING. THE TERMS OF THIS AGREEMENT SHOULD BE READ CAREFULLY BECAUSE ONLY THOSE TERMS IN WRITING ARE ENFORCEABLE. NO OTHER TERMS OR ORAL PROMISES NOT CONTAINED IN THIS WRITTEN CONTRACT MAY BE LEGALLY ENFORCED. YOU MAY CHANGE THE TERMS OF THIS AGREE-**

**MENT ONLY BY ANOTHER WRITTEN AGREEMENT.**

*Id.* § 535.17(3).

In addition, we find the dictionary definition of the term "conspicuous" to be helpful in ascertaining compliance with the statutory notification requirement. *See Midwest Automotive III, LLC v. Iowa Dep't of Transp.*, 646 N.W.2d 417, 426 (Iowa 2002) (looking to dictionary definition to determine meaning of statutory terms). Two common meanings of "conspicuous" are: (1) "obvious to the eye or mind: plainly visible"; and (2) "attracting or tending to attract attention by reason of size, brilliance, contrast, station." *Webster's Third New International Dictionary* 485 (unabr. ed.2002).

Turning to the guaranty at issue here, we find the following "miscellaneous provision":

This Guaranty, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Guaranty. No alteration of or amendment to this Guaranty shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

This language was not in boldface type, nor was the type larger than the type size of the surrounding paragraphs. There was nothing noticeable about this provision and it had no attributes that would have attracted the reader's attention to it. In short, the notification given to Fort in the guaranty was not conspicuous. *Compare Clinton Nat'l Bank v. Saucier*, 580 N.W.2d 717, 722 & n. 3 (Iowa 1998) (impliedly finding notification was adequate where notice was set off in boldface type and letters were all capital). Under these circumstances, the restriction set forth in section 535.17(2) requiring that any modifica-

tion to a credit agreement be in writing in order to be enforceable does not apply.

**D. *Abandonment of guaranty.*** Having determined that any release of Fort from his guaranty need not be in a writing signed by Hartford, we now examine the record to decide whether there is substantial evidence to support the trial court's factual finding that Hartford abandoned Fort's agreement to guarantee future loans made to DASL. "A guaranty contract may be abandoned by the creditor so far as it relates to future transactions, so that the guarantor is not liable for future advances to the principal debtor." 38 Am.Jur.2d *Guaranty* § 80, at 939 (1999). We think there is substantial evidence that such an abandonment occurred here.

The testimony and exhibits introduced at trial provide substantial support for the following facts. The parties to the initial transaction anticipated that Fort's involvement in the storage facility business would be limited to the construction phase and the initial operation of the facility. Consistent with this understanding, Titus undertook to buy out Fort's small ownership interest in DASL after construction was completed in the summer of 1998. One condition of the buyout was that Fort would be released from his $100,000 guaranty. Fort discussed the transaction with the president of Hartford and it was agreed that Fort would write a letter to Hartford setting forth the terms of the buyout. Fort did so, enclosing an assignment to Titus of Fort's interest in DASL. Fort instructed Hartford not to forward the assignment until Fort had been paid the purchase price, Fort's bill for services rendered to DASL had been paid, and Fort had been released from the guaranty. Hartford issued the checks, but did not prepare a formal, written release or cancellation of Fort's guaranty.

Nonetheless, Hartford's subsequent actions support the trial court's finding that Hartford thereafter abandoned Fort's guaranty. When permanent financing was put into place, Fort's guaranty was not listed as collateral. Fort was not notified of the terms of this financing, as would be the normal banking practice if Fort had been considered a guarantor of the debt. In contrast, when the guaranty was initially executed in 1996, Fort was provided a "notice of final agreement" informing him of the terms of the original construction loan he had agreed to guarantee. We think these well-supported facts support the trial court's determination that Hartford abandoned Fort's guaranty when Fort sold his interest in DASL to Titus.

**E. *Holder in due course.*** Beal Bank argues that any abandonment of the Fort guaranty by Hartford is not binding on the plaintiff because it is a holder in due course of the guaranty. In response, Fort contends Beal Bank had notice of Hartford's abandonment of Fort's guaranty and therefore holds the guaranty subject to Fort's defense of discharge. The trial court agreed with Fort on this issue, concluding "any reasonable banker should have known of Fort's discharge from [Hartford's] records."

Both parties cite to article 3 of Iowa's Uniform Commercial Code in support of their respective arguments. *See* Iowa Code ch. 554, art. 3 (1999). Accordingly, we accept the parties' apparent agreement as to the applicability of this statute and rely on its provisions in determining the correctness of the trial court's ruling.

Iowa Code section 554.3302(2) states that a defense of discharge "is effective against a person who became a holder in due course with notice of the discharge." *Id.* § 554.3302(2). "A person has '*notice*' of a fact when ... from all the facts and

circumstances known to the person at the time in question the person has reason to know that it exists." *Id.* § 554.1201(25)(*c*). "A person 'knows' or has 'knowledge' of a fact when that person has actual knowledge of it." *Id.* Given the applicable standard of review, our role is simply to ascertain whether there is substantial evidence to support the trial court's factual finding that Beal Bank had "notice," as that term is defined in chapter 554, of Fort's discharge.

Beal Bank makes much of the fact that the DASL loan file it obtained upon purchase of Hartford's assets did not contain Fort's letter to Hartford making his assignment conditional on Hartford's release of Fort's guaranty. Notwithstanding Beal Bank's ignorance of this communication, we think the record provides substantial evidentiary support for the trial court's factual finding that Beal Bank had notice of Hartford's 1998 abandonment of the Fort guaranty. Fort's expert witness, who had considerable experience in the banking industry, testified that it was the custom and practice in that industry to list all guarantors in the promissory note. Yet, Beal Bank knew that the loan documents representing DASL's indebtedness to Hartford did not list Fort's guaranty as collateral. Beal Bank also knew that Fort had not been given a "notice of final agreement," as debtors and guarantors customarily are. Based on the information actually known by the plaintiff, it had "reason to know" that Fort had been discharged from his obligation.

In conclusion, there is no basis to overturn the trial court's factual finding that Beal Bank had notice of Fort's discharge, as this finding is supported by substantial evidence. Similarly, we find no error in the trial court's conclusion that in view of Beal Bank's knowledge, its status as a holder in due course did not prevent Fort's assertion of his discharge defense against the plaintiff in this action.

IV. *Summary.*

Upon our de novo review of the trial court's ruling that Beal Bank could not foreclose the mortgage executed by Vokoun on the North 3rd Street property, we affirm. This property qualified as Vokoun's homestead at the time of the mortgage and the absence of her spouse's consent to this encumbrance renders the mortgage void and unenforceable.

Upon our review of the trial court's ruling that Beal Bank could not recover under Fort's guaranty because it had been abandoned by Hartford, we also affirm. The statute of frauds for credit agreements contained in Iowa Code section 535.17(2) does not apply because Fort was not given conspicuous notice that any oral modifications to his guaranty agreement were not enforceable. In addition, our review of the record reveals substantial evidence to support the trial court's factual findings (1) that Hartford abandoned Fort's guaranty as to any future advances to DASL when Fort sold his interest in DASL, and (2) that Beal Bank had notice of this abandonment so as to take the guaranty subject to the defense of discharge.

**AFFIRMED.**