# IN THE COURT OF APPEALS OF IOWA

No. 22-0774
Filed February 22, 2023

**ATERRA 144, 1960 GRAND AVENUE, WDM, LLC,**
    Plaintiff-Appellee,

**vs.**

**DAVID B. ANDERS,**
    Defendant-Appellant,
_____

Appeal from the Iowa District Court for Polk County, Michael D. Huppert, Judge.

Following a bench trial, the defendant challenges the district court's ruling that his 2005 guaranty is enforceable by successor landlords and the award of attorney fees. **AFFIRMED.**

Brett T. Osborn and Emily X. Douglas of Abbott Osborn Jacobs PLC, West Des Moines, for appellant.

Matthew A. McGuire, Mitchell R. Kunert, and Kevin B. Patrick (until withdrawal) of Nyemaster Goode, P.C., Des Moines, for appellee.

Heard by Vaitheswaran, P.J., and Greer and Chicchelly, JJ.

**GREER, Judge.**

Following a bench trial, David Anders appeals the district court ruling that his 2005 personal guaranty of a lease was enforceable by successor landlord Aterra 144, 1960 Grand Avenue, WDM, LLC (Aterra) and the judgment entered against him. Anders raises a number of alternative theories why the district court erred in its ruling: (1) Aterra's predecessor in interest abandoned his guaranty, (2) his guaranty was discharged through accord and satisfaction, and (3) Aterra waived his guaranty by failing to rely on it when it purchased the leased premises in 2019. Anders also challenges the district court's award of attorney fees to Aterra as excessive.

**I. Background Facts and Proceedings.**

In April 2005, Crazy Chicken, LLC—a Nebraska limited liability company— sought to enter a lease agreement with the then-owners of a shopping center in West Des Moines. The property was managed by John Mandelbaum,[1] and he negotiated the lease. Anders, as one of the members of the Crazy Chicken, signed the lease on behalf of the LLC. The lease agreement was for a term of five years and six months (until January 30, 2011) and gave Crazy Chicken the option to renew for up to two additional five-year periods so long as Crazy Chicken notified the landlord no later than six months prior to the expiration of the then-current lease term, was not in default, and had not been late on rent more than three times. Anders was the only member of Crazy Chicken asked to give a personal guaranty, and he did. He guarantied "the timely payment of rent and all other charges to be

---

[1] Technically Mandelbaum Commercial Real Estate Services, L.L.C. was the property manager, of which John Mandelbaum was the owner.

paid by [Crazy Chicken] under the Lease" and also agreed the guaranty would "remain in full force and effect as to any renewal or extension of the Lease regardless of any modification or amendment of the Lease."

Sometime in 2007 or 2009,[2] Anders transferred his ownership interest in Crazy Chicken to other members. This left Dawnielle Beister, Kenneth Beister, Collin Nabity,[3] and Chicken Coop of Kearney, Inc. as the owners of Crazy Chicken.

In June 2010, Kenneth and Dawnielle[4] notified Mandelbaum that Crazy Chicken wanted to renew the lease. A few months later, in October, Crazy Chicken and Mandelbaum executed the "first addendum to the lease." In it, Crazy Chicken and Mandelbaum agreed "the Lease is continued and has not lapsed." It also included the following:

> 5. Landlord acknowledges that the Ownership interests of Crazy Chicken, LLC have changed and that Dawnielle Beister now owns a 25% interest, Kenneth Beister now owns a 25% interest. [Collin] Nabity now owns a 35% interest and Chicken Coop of Kearney, Inc. now owns a 15% interest. David Anders has sold his entire ownership position and is no longer an owner of Crazy Chicken, LLC; and
> 6. Dawnielle Beister, Kenneth Beister and [Collin] Nabity have each agreed to personally guarantee the Lease, as amended, and have executed and had notarized the attached personal guarantees; and
> 7. All the other terms and conditions of the initial Lease shall remain the same and are hereby ratified and confirmed by the parties.

---

[2] There is contradicting evidence about the date in the record. Multiple witnesses testified Anders sold his interest in Crazy Chicken in 2007, but a letter from an attorney written in March 2010, which Anders introduced into evidence at trial, states that Anders transferred his member interests on January 1, 2009.
[3] Nabity's first name is spelled as both "Colin" and "Collin" in the record. For consistency, we will use "Collin."
[4] We refer to Kenneth and Dawnielle Beister by their first names to avoid confusion.

Kenneth, Dawnielle, and Nabity each signed the first addendum on behalf of Crazy Chicken.

Crazy Chicken and Mandelbaum executed a second addendum to the lease in 2015 and then a third addendum in 2016.

In 2019, the owners of the shopping center sold the property to Aterra. As part of the purchase agreement, Aterra purchased the "space leases," which the contract defined as "all tenant space lease(s), license(s), concessions or other occupancy or use agreements, including all modifications, addenda and supplements thereto and guarantees thereof, applicable to any part of the Real Estate." The purchase agreement specifically included "any guarantees or warranties relating to the Real Estate or Personal Property." The previous owners and Aterra also executed an assignment and assumption of leases, which included Crazy Chicken's lease.

In July 2020, Crazy Chicken and a manager for Aterra executed the fourth addendum to the lease agreement.[5]

Then in August, Aterra advised Crazy Chicken that it was in default of the lease agreement "for failure to pay rent and other charges required under the terms of the" lease and "for vacating and abandoning the premises" in violation of the agreement. Aterra initiated this lawsuit a few months later. It brought suit against Crazy Chicken, Anders, Nabity, Dawnielle, and Kenneth, alleging Crazy Chicken

---

[5] This addendum provided a period of rent abatement due to the COVID-19 pandemic and added four months to the term of the lease. Otherwise, "[e]xcept as modified by the terms of [the] Amendment, the Lease and all terms and conditions contained therein . . . remain[ed] in full force and effect."

breached the lease agreement and Anders, Nabity, Dawnielle, and Kenneth each breached their personal guaranties of the lease.

Anders moved for summary judgment, arguing his 2005 guaranty of the lease agreement was not enforceable because (1) the previous owners of the shopping plaza—Aterra's predecessor in interest—abandoned his guaranty and accepted others in its place and (2) Aterra was barred from recovery under the doctrine of accord and satisfaction. Anders acknowledged he did not have a formal written release but asserted that the first addendum to the lease established that Mandelbaum accepted the new guaranties from Crazy Chicken's remaining members in place of Anders's personal guaranty.

Aterra resisted. It highlighted the language from Anders's personal guaranty stating that it "shall remain in full force and effect as to any renewal or extension of the Lease and regardless of any modification or amendment of the Lease." Additionally, Aterra attacked the evidence Anders offered to support his motion for summary judgment, arguing that his "sole support for each one of his arguments is inadmissible hearsay. Anders submits a self-serving affidavit signed by him in which he avers that the agent for the predecessor landlord, John Mandelbaum, allegedly told him that his Guaranty was discharged. This hearsay is inadmissible for purposes of summary judgment." Aterra asserted that Anders, who had the burden to show his guaranty was abandoned or discharged by accord and satisfaction, could not establish his claims as a matter of law—he needed facts to demonstrate that the guaranty was relinquished or discharged, and those facts were under dispute.

Aterra moved for summary judgment against Anders, Nabity, and Kenneth—the remaining defendants; the court already entered default judgment against Dawnielle and Crazy Chicken in February 2021.

The court granted Aterra's motion for summary judgment as to both Nabity and Kenneth and entered judgment against them jointly and severally in the amount of $144,666.84. But it denied Anders's and Aterra's cross-motions for summary judgment, concluding there were genuine issues of material facts that needed to be resolved by a factfinder in a trial. The court ruled in part:

> [T]he court is disinclined to conclude at this stage of the proceedings that the issue of whether Anders' continuing guaranty was either revoked, terminated or abandoned can be ruled upon as a matter of law. Of particular importance to the court is why only Anders was one of four principals within Crazy Chicken to be required to execute a personal guaranty in 2005 and why the landlord referenced the need for the other principals to execute a guaranty when the lease was extended in 2010. In this regard, the court disagrees with Anders' position that the language contained within the first addendum renders the terms of his guaranty to be ambiguous and as such subject to an interpretation in his favor. The language used in both the 2005 lease and 2010 addendum is not ambiguous; however, the parties' differing versions of the underlying events raise issues of credibility which can only be resolved by the trier of fact in a trial.

(Footnote omitted).

The case was tried to the bench in February 2022. Mandelbaum was unavailable to testify due to a medical condition that affected his memory. *See* Iowa R. Evid. 5.804(a)(4). But Debra Lawrence, who worked for Mandelbaum's company and shared an office with Mandelbaum from 1999 until 2018, testified. Lawrence remembered that Anders "wanted to be released from the lease." Although she could not say when it occurred, Lawrence witnessed a conversation between Anders and Mandelbaum that took place in the office sometime before

the first addendum was executed. In that conversation, Anders was "confirming that he would be released from the lease, that he was no longer going to be an active participant in [Crazy Chicken], and he was selling it to the [other] partners." And as a result of that conversation, Mandelbaum created the first addendum to the release to address Anders's request. But Lawrence would not agree that the discussion was about "releasing [Anders] from his obligations"; she reiterated that what she recalled was that the conversation centered on Anders wanting "off the lease." According to Lawrence, in Mandelbaum's usual practice, Crazy Chicken's 2010 written request to exercise the option to renew would have been sufficient to renew the lease—no addendum was necessary.[6] But the first addendum to the lease was drafted at least in part because of Anders's request. And the personal guaranty that Nabity provided[7] in 2010 in accordance with the first addendum to the lease stated "the Landlord is unwilling to enter into the Lease renewal unless the Guarantors executed and deliver this Guaranty." In other words, the renewal of the lease in 2010 was conditioned on the remaining Crazy Chicken members agreeing to execute personal guaranties.

---

[6] At oral argument, Anders referenced an affidavit of Lawrence that he believed supported his position. But we find the November 1, 2021 affidavit, which is part of the record, is not inconsistent with Lawrence's trial testimony as the affidavit states, "It was also [Mandelbaum's] business practice not to release individuals from personal guaranties and, if it was done, the release would be in writing and would specifically state that the guarantor is being released from the obligations of the personal guaranty."

[7] Kenneth and Dawnielle were also supposed to provide personal guaranties under the terms of the first addendum to the lease. However, as became clear during the current legal proceedings, neither ever did so. Nabity was the only member who followed through on the requirement.

On cross-examination, Lawrence testified that Mandelbaum's "standard business practice . . . was to hold all guaranties regardless whether they—he let them out of the lease." When asked if she could repeat her testimony, Lawrence stated, "[Mandelbaum] would maintain the personal guaranties regardless of whether that person was signing the lease or not." As far as she knew, Mandelbaum had not ever released anyone from their personal guaranty. Lawrence testified that she "did not hear [the phrase 'personal guaranty'] during that conversation" she overheard between Lawrence and Mandelbaum. Lawrence sent documents for the shopping center to Aterra during its due-diligence period before the company purchased the property; Anders's personal guaranty was included in those documents, and she did not tell Aterra that Anders's guaranty was no longer in force.

Anders testified in his own defense. He claimed he wanted to be taken off the lease once he sold his interest in Crazy Chicken in 2007. When that did not occur, Anders followed up with Mandelbaum in early 2010—as the renewal period was approaching. Anders had an attorney provide Mandelbaum proof of the ownership structure of Crazy Chicken. And, based on Anders's conversations with Mandelbaum, Mandelbaum prepared the first addendum to the lease. Anders testified he saw the first addendum to the lease in Mandelbaum's office before it was executed; he went to Mandelbaum's office to obtain the proof he needed for his bank that he had been released from his personal guaranty. The following exchange took place during direct examination of Anders:

> Q. What was—what did you ask of Mr. Mandelbaum when you went to his office? A. In 2010?

Q. Yes, in 2010. A. I wanted proof I was off the lease. Or off the Guaranty. And he said . . . . He said he would have to get the three signatures for them to even sign, renew that lease, in order to get me off. So he was putting on them three and taking me off is what was discussed.

Q. Okay. So the discussion you had with Mr. Mandelbaum when you requested to be removed as a guarantor of the lease, was Mr. Mandelbaum's response was he was going to require that Ken Beister, Dawnielle Beister, and Collin Nabity Guaranty the lease? You have to answer orally. A. Personal Guaranty, yes.

Q. Did he say that would be a condition of the renewal of the lease? A. Yes.

Q. Did he also provide you with a copy of the Guaranty that he had drafted to be signed? A. Yes.

. . . .

Q. So you saw the Guaranty that he prepared that ultimately Collin Nabity signed? A. Yes.

Q. And as a result of that conversation, did he agree to release you from the Guaranty? A. Yes.

Anders testified Mandelbaum told him his position on guaranties was that he "didn't let people off, [but] that he would make an exception for [Anders] since [he] wasn't with the company at all." Anders also testified he gave the first addendum to the lease and the guaranty Nabity ultimately signed to his banker as evidence of his release from his personal guaranty. On cross-examination, Anders admitted there was not any language in the first addendum to the lease specifically stating that he was released from his person guaranty. And that was true in spite of Anders's assertion that the first addendum was drafted as a result of his request to be released from his guaranty and that he read through the drafted addendum before it was executed—Anders never insisted on explicit language about being released from the guaranty. Additionally, Anders was never given a separate, formal release from the guaranty. And the letter Anders had an attorney send to Mandelbaum in 2010 showing the ownership interests of Crazy Chicken did not state Anders's request to be released from the guaranty. Anders eventually

agreed that he did not "have any documentation, whether it's communication, e-mails, notes, nothing that states that either [he was] requesting to be released from [his] personal Guaranty or that the landlord ha[d] released [him] from [his] personal Guaranty."

The district court filed its written ruling on March 16, 2022. It concluded Anders's 2005 personal guaranty was a continuing guaranty, which meant that it remained valid until revoked or terminated by some rule of law. Because a continuing guaranty does not automatically terminate when the guarantor relinquishes ownership or interest in the business the personal guaranty benefits, whether Anders's guaranty had been revoked depended on Anders's and Mandelbaum's "intent after Anders no longer was an owner of Crazy Chicken and the first addendum was executed in 2010." In deciding between the two competing version of facts—whether Mandelbaum made an exception and released Anders from his guaranty or no release ever took place—the court noted it was "highly skeptical" of Anders's testimony that Mandelbaum made an exception for Anders because "there is absolutely no evidentiary support to corroborate these statements." The court stated that, "as best as [it could] tell, Anders' version of the Mandelbaum conversation regarding the aforementioned 'exception' was never disclosed by Anders prior to trial in any discovery response, nor was it specified in his affidavit supporting his resistance to [Aterra's] motion for summary judgment." Ultimately, the court ruled that

> Anders' unsupported eleventh-hour self-serving attribution to Mandelbaum [was] considerably lacking in credibility, in light of the considerable evidence to the contrary. The guaranty itself clearly indicates that it shall continue despite any waiver or forbearance on the part of the landlord. Lawrence provided credible testimony

regarding Mandelbaum's practice regarding the continuation of guaranties, as well as her own firsthand knowledge from overhearing Mandelbaum and Anders speak, at which time the only focus was Anders' liability under the lease, not the guaranty.

Because the changed circumstances of Anders's business relationships did not result in termination of his personal guaranty as a matter of law and because the credible evidence did not establish that Mandelbaum released Anders from his guaranty, Anders's guaranty was enforceable, which made Anders liable for Crazy Chicken's default under the lease agreement. The court entered judgment against Anders jointly and severally with the other defendants in the amount of $144,666.84. The court also ruled that Aterra could request attorney fees and expenses from the defendants.

Anders filed a motion under Iowa Rule of Civil Procedure 1.904(2), asking the court to reconsider, amend, and enlarge its ruling. The district court denied the motion on April 13.

In the meantime, on April 5, Aterra applied for $108,169.80[8] in attorney fees and $1825.30 in costs. Anders resisted, arguing the case was not complicated and the amount of attorney fees requested was not reasonable. Anders pointed to certain entries he asserted were duplicative and also claimed Aterra's counsels' work was excessive. The court scheduled a hearing on the fee application for a later date.

Then, on May 6, Anders filed notice of appeal.

---

[8] We take this amount from the court's ruling on the application; the original application—filed before a contested hearing on this matter—indicated a request of $106,344.50.

The hearing on Aterra's request for fees took place on May 27.[9]  In a written ruling filed June 7, the court stated that Anders did "not dispute the reasonableness of the hourly rates charged by counsel and support staff, nor [does he] dispute the requested costs in the amount of $1825.30."   The court rejected Anders's contention that this was not a complex case, noting there were a number of defendants and the question of each person's individual liability depended on various legal issues, which became quite involved.   Additionally, "the parties underwent extensive motion practice, including a pre-answer motion to dismiss and cross-motions for summary judgment, with numerous resistances, replies and sur-replies."  Still, the court adjusted three specific time entries, totaling $4527.00, by which the court reduced the requested fee award.  The court entered judgment of $103,642.80 in favor of Aterra and against Anders, Nabity, and Kenneth jointly and severally.

Anders did not file a second notice of appeal following the attorney-fee ruling.

## II. Standard of Review.

The case was tried to the bench at law.  *See Burton E. Tracy & Co. v. Frink*, 520 N.W.2d 316, 318 (Iowa Ct. App. 1994) ("Generally, an action of contract is at law."); *see also Bacon v. Bacon*, 567 N.W.2d 414, 417 (Iowa 2017) (providing that the case is tried as a law action when the district court rules on objections as they are made).  "We review the judgment of a district court following a bench trial in a law action for correction of errors at law."  *Chrysler Fin. Co. v. Bergstrom*, 703

---

[9] This hearing was reported, but we do not have a transcript of the proceeding.

N.W.2d 415, 418 (Iowa 2005). "The district court's findings of fact have the force of a special verdict and are binding on us if supported by substantial evidence." *Id.* "In determining whether substantial evidence exists, we view the evidence in the light most favorable to the district court's judgment." *Id.*

### III. Discussion.

#### A. Whether Anders's Guaranty Remains Enforceable.

"A guaranty is a contract by one party to another party for the fulfillment of the promise of a third party." *Great S. Bank v. Riveradio, L.L.C.*, No. 11-1500, 2012 WL 1440227, at *1 (Iowa Ct. App. Apr. 25, 2012) (citing *City of Davenport v. Shewry Corp.*, 674 N.W.2d 79, 86 (Iowa 2004)). So, the rules and principles that apply to contracts apply to guaranties. *See Andrew v. Austin*, 232 N.W. 79, 81 (Iowa 1930) ("The same rule is to be applied in the construction of contracts of guaranty as other contracts.").

As the district court determined, the personal guaranty Anders gave in 2005 was a continuing guaranty. *See Maresh Sheet Metal Works v. N.R.G., Ltd.*, 304 N.W.2d 436, 440 (Iowa 1981) (providing a guaranty "is continuing if it contemplates a future course of dealing over an indefinite period"). While a "restricted guaranty" is one "limited to a single transaction or a limited number of specific transactions," "[a] continuing guaranty remains valid until revoked or terminated by some rule of law." *Id.* No one disputes that the 2005 personal guaranty was a valid contract at the time Anders and Mandelbaum executed it. The question is whether it was still enforceable in 2020 when Aterra sought to enforce it; Anders offers several theories why his guaranty is no longer valid.

**1. Abandoned by Predecessor in Interest.**

First, Anders argues the guaranty is no longer enforceable because Aterra's predecessor in interest—the previous owners of the shopping center—abandoned the guaranty.

Parties to a valid contract may choose to abandon it. *See Severson v. Elberon Elevator, Inc.*, 250 N.W.2d 417, 421 (Iowa 1977) ("[P]arties to a valid contract may rescind or abandon it . . . ."). And, once abandoned, the contract is no longer enforceable. *Henderson v. Beatty*, 99 N.W. 716, 718 (Iowa 1904) ("It is well settled that, where either party has . . . agreed to abandon or rescind such a contract, and this is acquiesced in, he may not thereafter maintain an action for its enforcement."). "Abandonment of a valid contract may be accomplished by express agreement of the parties . . . ." *Iowa Glass Depot, Inc. v. Jindrich*, 338 N.W.2d 376, 380 (Iowa 1983). And that agreement to abandon "may be evidenced by both words and conduct." *Severson*, 250 N.W.2d*.* at 421–22. Anders, as the party asserting the contract was abandoned, has the burden to prove it. *See id.* at 421.

As he did to the district court, Anders asserts that he spoke with Mandelbaum and voiced his request to be released from the obligations of the personal guaranty. He claims that Mandelbaum agreed to give up Anders's guaranty and, as a result of that decision, executed the first addendum to the lease, in which three Crazy Chicken members pledged their own personal guaranties.

These facts, if true, are enough to find the personal guaranty was abandoned by Aterra's predecessor in interest.[10]

But whether Mandelbaum intended to release Anders from his personal guaranty is a fact question. *See Ward v. Inc. Town of Clover Hills*, 38 N.W.2d 109, 112 (Iowa 1949) ("Abandonment is the intentional relinquishment of a known right. It involves both intent and some act by which the intent is carried into effect."); *see also Ball v. Williams*, 93 N.W.2d 723, 727 (Iowa 1958) ("[A]bandonment is a question of fact." (citation omitted)). And the district court found Mandelbaum did not agree to abandon Anders's guaranty, noting the only evidence of it was Anders's testimony, which came at the "eleventh hour" and was "self-serving." The court's finding that Anders's testimony was "considerably lacking in credibility" combined with the lack of other evidence hamstrings Anders's chances on appeal, as "[w]e are especially deferential to the district court's assessment of witness credibility." *Johnson v. Kaster*, 637 N.W.2d 174, 178 (Iowa 2001) (citation omitted).[11]

Anders urges us to rely on the fact that the first addendum to the lease was created—with its requirement of three new personal guaranties—as other evidence of Mandelbaum's assent to the abandonment of Anders's guaranty. But, like the district court, we are not convinced that the mere existence of the first addendum to the lease shows Mandelbaum's intent to abandon Anders's personal

---

[10] It is undisputed that Mandelbaum had the authority to release Anders from the contract of guaranty.

[11] In contrast, the district court found Lawrence "provided credible testimony regarding Mandelbaum's practice regarding the continuation of guaranties, as well as her own firsthand knowledge from overhearing Mandelbaum and Anders speak, at which time the only focus was Anders' liability under the lease, not the guaranty."

guaranty. It is possible Mandelbaum wanted personal guaranties to replace Anders's, which Mandelbaum had decided to abandon, but it is just as possible that Mandelbaum wanted additional security to shore up the landlord's chances at recovery should Crazy Chicken default. *Cf. Brenton Bank & Tr. Co. v. Beisner*, 268 N.W.2d 196, 198 (Iowa 1978) ("We note at the outset that the bank's possession of other collateral would not relieve [the guarantor] or his personal representative on the guaranty."); *see also* 38 Am. Jur. 2d *Guaranty* § 85 (1968) ("The fact that the creditor, in order to insure payment of the debt which is due him, has taken additional security therefor does not have the effect of releasing or discharging the guarantor of liability on his contract of guaranty."). "Evidence is not insubstantial merely because it would have supported contrary inferences." *Norland v. Iowa Dep't of Job Serv.*, 412 N.W.2d 904, 913 (Iowa 1987) (citation omitted). And "we construe the evidence broadly to uphold, rather than defeat, the trial court's judgment." *Grall v. Meyer*, 173 N.W.2d 61, 62 (Iowa 1969); *see also Etchen v. Holiday Rambler Corp.*, 574 N.W.2d 355, 359 (Iowa Ct. App. 1997) ("The question an appellate court faces is not whether the evidence might support a different finding, but whether the evidence supports the findings actually made.").

Substantial evidence supports the district court's finding that there was not an express agreement between Mandelbaum and Anders to abandon Anders's personal guaranty.

**2. Accord and Satisfaction.**

Next, Anders claims his personal guaranty cannot be enforced because it was discharged through accord and satisfaction. "Accord and satisfaction is a means of discharging a contractual obligation by agreement of the parties to render

and accept a different and substituted performance as full satisfaction of the preexisting claim." *DuTrac Cmty. Credit Union v. Hefel*, 893 N.W.2d 282, 290 (Iowa 2017). It is "[a] new contract substituted for an old contract, which is thereby discharged, or for an obligation or cause of action which is settled." *Kellogg v. Iowa State Traveling Men's Ass'n*, 29 N.W.2d 559, 567 (Iowa 1947). And it is Anders "who has the burden of establishing the defense of accord and satisfaction." *DuTrac*, 893 N.W.2d at 290.

For there to have been an accord and satisfaction, Mandelbaum had to understand that he was taking the new personal guaranties in place of Anders's guaranty.[12] *See Robinson v. Norwest Bank*, 434 N.W.2d 128, 130 (Iowa Ct. App. 1988) ("There can be no accord and satisfaction unless the creditor, or party receiving the thing or promise offered, understands, or from the circumstances of the offer, or the acts or declarations with which it is accompanied, is bound to understand, that he takes it in full satisfaction of his claim."). In other words, whether an accord and satisfaction occurred rests on whether Mandelbaum intended to accept the new guaranties in place of Anders's. *See id.* ("Whether there is accord and satisfaction ordinarily involves a pure question of intention.").

Anders's only support for this claim is a blanket assertion that the facts are different than the district court found them to be, stating: "The facts establish Aterra's predecessor in interest released Anders and accepted three new guaranties, and in doing so, discharged Anders' guaranty." But, as with his claim

---

[12] We ignore that Mandelbaum never actually got three personal guaranties; while Kenneth, Dawnielle, and Nabity each pledged one as part of the first addendum to the lease, only Nabity signed and returned his.

about abandonment, Anders relies on his testimony, which the district court did not credit. The district court was persuaded that Mandelbaum did not intend to release Anders; instead, Mandelbaum stuck with his general policy of holding each person to their guaranty, irrespective of whether that person left the business or got off the lease. "Our task is not to weigh the evidence or the credibility of the witnesses. Rather, our task is to determine whether substantial evidence supports the district court's findings according to those witnesses whom the court believed." *Tim O'Neill Chevrolet, Inc. v. Forristall*, 551 N.W.2d 611, 614 (Iowa 1996) (internal citation omitted). Substantial evidence supports the district court's conclusion that an accord and satisfaction did not take place.

### 3. Waived by Aterra.

Finally, Anders argues Aterra's predecessor in interest abandoned his personal guaranty and, because Aterra had notice of that fact, he is no longer liable for it. He relies on *Beal Bank v. Siems*, 670 N.W.2d 119, 127–28 (Iowa 2003). But as Aterra correctly points out, this argument is premised on the conclusion that Mandelbaum—acting for the predecessor in interest—abandoned Anders's personal guaranty. Yet the district court found, and we affirm, that Mandelbaum did not abandon the guaranty. So this claim also fails.

### B. Attorney Fees.

Anders challenges the district court's award of attorney fees to Aterra, arguing the amount awarded was excessive.[13] However, Anders's failure to file a

---

[13] Anders does not contest that the lease agreement allowed for the prevailing party in a judicial contest to recover reasonable attorney fees from the other party. *See* Iowa Code § 625.22 (2020) ("When judgment is recovered upon a written

second appeal after the entry of judgment on the attorney fees award means we are without jurisdiction to consider this issue. *See* Iowa R. App. P. 6.103(2) ("A final order or judgment on an application for attorney fees entered after the final order or judgment in the underlying action is *separately appealable*. The district court retains jurisdiction to consider an application for attorney fees notwithstanding the appeal of a final order or judgment in the action. If the final order or judgment in the underlying case is also appealed, the party appealing the attorney fee order or judgment shall file a motion to consolidate the two appeals." (emphasis added)); *see also Iowa State Bank & Tr. Co. v. Michel*, 683 N.W.2d 95, 110 (Iowa 2004) ("Because the matter of attorney fees is a collateral issue and was decided after the defendants had appealed the court's ruling on the merits of the lawsuit, *the defendants were required to separately appeal the award of attorney fees to bring that matter before us for review*. Since the [defendants] failed to do so, we may not consider the district court's attorney fee award on appeal." (emphasis added)).

**IV. Conclusion.**

Because Anders's personal guaranty is still enforceable, we affirm the district court's ruling and judgment against him. We do not consider his challenge to the award of attorney fees, as he failed to appeal that judgment.

**AFFIRMED.**

---

contract containing an agreement to pay an attorney fee, the court shall allow and tax as a part of the costs a reasonable attorney fee to be determined by the court.").